J-A14016-15, J-A14017-15, J-A14018-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MELISSA ANN BRODBECK | |
| Appellant | No. 1730 MDA 2014 |

Appeal from the Judgment of Sentence September 16, 2014
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-SA-0000220-2014

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BARBARA A. BRODBECK | |
| Appellant | No. 1731 MDA 2014 |

Appeal from the Judgment of Sentence September 16, 2014
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-SA-0000219-2014

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PAUL MICHAEL LEAHY | |
| Appellant | No. 1732 MDA 2014 |

Appeal from the Judgment of Sentence September 16, 2014

J-A14016-15, J-A14017-15, J-A14018-15

In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-SA-0000232-2014

BEFORE: BENDER, P.J.E., JENKINS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY JENKINS, J.:           **FILED JUNE 05, 2015**

      Appellants Melissa Brodbeck, Barbara Brodbeck, and Paul Leahy (collectively, "Appellants") appeal from the judgments of sentence entered in the York County Court of Common Pleas following their convictions for cruelty to animals.[1]  Paul Leahy also challenges his conviction for harassment.[2]  We affirm.

      The relevant facts and procedural history of this case are as follows. On February 17, 2014, Humane Society Police Officer[3] Amy Kessler received an anonymous telephone call regarding animals living in poor and unsanitary conditions at the property of Paul Leahy ("Leahy"), his girlfriend, Melissa Brodbeck ("Melissa"), and her mother, Barbara Brodbeck ("Barbara"), located in York County, Pennsylvania.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 5511(c)(1).

[2] 18 Pa.C.S. § 2709.  Neither Melissa Brodbeck nor Barbara Brodbeck were charged with or convicted of harassment.

[3] Pennsylvania's Legislature has empowered Humane Society Police Officers to enforce the provisions of 18 Pa.C.S. § 5511.  **See** 22 Pa.C.S. § 3708(a).

- 2 -

On February 19, 2014, Officer Kessler visited the property. When Barbara opened the door, Officer Kessler smelled a strong odor of urine and feces emanating from within the house. Officer Kessler introduced herself, gave Barbara her business card, informed Barbara that she was there to investigate an animal cruelty call, and explained that she needed to see the animals. Melissa led Officer Kessler to the back of the property, where she commenced her investigation.

Behind the house, Officer Kessler observed an open shed, two pigs, multiple chickens, and four (4) Newfoundland dogs[4] living together outside in a single flea-infested, feces-covered dog box that could not fit all four dogs. The dogs' water bowl was frozen solid. Permeating the area was an intense odor of excrement caused by massive amounts of unattended dog feces.[5] Further, the area contained multiple wires and nails sticking out at dog eye and body height.

The dogs themselves were flea-infested and emaciated. Feces, which the dogs had clearly been walking and sliding around in, covered the dogs.

---

[4] In all, there were six Newfoundlands on the property: Bear, Anne, Panda, Kodiak, Koala, and Teddy.

[5] Officer Kessler observed some of the feces consisted of diarrhea and some contained blood in the stool.

Two of the dogs had ear and skin bacterial infections. Another suffered anatropia[6] in both eyes. Scrapes, scratches, and scars covered each dog.

Officer Kessler also observed twelve horses and a donkey together in an area that totaled one-third or one-half of a manure-covered acre adjacent to the dog pen. The area contained bale feeders, but no food feeders and no signs of hay, grass, or grain. Further, of the two drinking troughs Officer Kessler observed, one was completely empty and the water in the other was frozen solid.

A horse named Reba immediately drew Officer Kessler's attention. Melissa gave Officer Kessler permission to examine Reba. Officer Kessler noted Reba was extremely emaciated and covered in bite marks, dermatitis, and horse lice. Reba's condition was so terrible that Officer Kessler felt Reba might have died without immediate veterinary attention.

As Officer Kessler examined Reba, Leahy angrily approached and began screaming at her. Leahy told Officer Kessler that he had just rescued the horse, that she was old and thin, but that otherwise nothing was wrong with the animal. He also told Officer Kessler she was an incompetent idiot. As Leahy's behavior became increasingly agitated, Officer Kessler called the Pennsylvania State Police.

---

[6] Anatropia, also known as anaphoria, is an ocular condition marked by a tendency of resting eyes to turn upward. Officer Kessler explained that the eyes of this dog, Panda, were rolled so that her eyelashes were rubbing against her eyes constantly, causing great and persistent discomfort.

When Leahy stepped away, Melissa explained that she and Leahy had acquired Reba two months prior and that her condition was even worse at that time. Melissa produced a veterinary dental bill and a telephone number for Kirsten Henry, Reba's previous owner. Officer Kessler contacted Ms. Henry, who explained that she had given Leahy and Melissa the horse almost a year ago, and that Reba was in good health at the time. Melissa then admitted that she and Leahy did have Reba since the spring of 2013, and that the horse had looked better when she arrived. Upon Leahy's return, he denied that anything was amiss, refused veterinary care for Reba, and continued to insult Officer Kessler.

When the State Police arrived, Leahy[7] and Melissa agreed to turn Reba over to the authorities, the horse was confiscated, and the authorities issued two citations for summary cruelty to animals.

Later that day, at 3:37 p.m. on February 19, 2014, Leahy telephoned Officer Kessler and screamed insults and accusations at her. Leahy told Officer Kessler that she had no right to take his horse, that she needed to return the horse, that she had stolen his horse, and that he was going to come after Officer Kessler. Leahy repeatedly called Officer Kessler a "bitch"

---

[7] At this point, Leahy disavowed the notion that he owned Reba to both Officer Kessler and Pennsylvania State Police Trooper Ryan Speece.

and a "fucking idiot". Officer Kessler told Leahy not to call her again, and then called the State Police to file a complaint.

On February 28, 2014, authorities returned to the property to execute a search warrant. On that date, the authorities seized the rest of the animals[8] and issued further cruelty to animals citations, as well as a summary harassment citation to Leahy regarding his conduct towards Officer Kessler.

The Commonwealth initiated proceedings in the appropriate Magisterial District Court, which held a two-part summary hearing on April 17, 2014, and May 21, 2014. The Magisterial District Justice found Appellants guilty of twenty-one counts of cruelty to animals and one count of harassment. Appellants filed summary appeals. Following a summary appeals hearing conducted in the York County Court of Common Pleas on September 16, 2014, the trial court found Melissa and Leahy guilty of three counts of cruelty to animals[9] and Barbara guilty of two counts of cruelty to animals.[10]

_____

[8] In addition to the Newfoundlands, the authorities found further animals inside the house, including a dachshund and puppies.

[9] The trial court consolidated the counts from 21 down to 3 counts as follows: Count 1 regarding the horses and the donkey; Count 2 regarding four of the Newfoundlands; and Count 3 regarding other animals found within the home. **See** Docket No. CP-67-SA-0000232-2014, pp. 4, 7.

[10] Count 2 regarding four of the Newfoundlands; and Count 3 regarding other animals found within the home. **See** Docket No. CP-67-SA-0000219-2014, pp. 4, 6. The court found Barbara not guilty of Count 1 relating to the horses and the donkey.

The trial court also found Leahy guilty of one count of summary harassment. The trial court imposed sentences consisting of $750.00 fines and pro-rata shares of restitution amounts for each of the cruelty to animals convictions,[11] and costs and a $300.00 fine for Leahy's harassment conviction. Appellants timely appealed. Appellants and the trial court all complied with Pennsylvania Rule of Appellate Procedure 1925.[12] This Court consolidated the matters per Pa.R.A.P. 513.

Appellants now raise the following claim for review:

[1.] Whether the [c]ourt's determination of [Appellants'] guilt in regards to the cruelty to animals charges was supported by sufficient evidence and the applicable law.

Leahy's Brief, p. 7; Barbara's Brief, p. 7; Melissa's Brief, p. 7. Leahy raises the following additional claim as to his harassment conviction:

_____

[11] The court ordered Leahy to pay $13,533.64 for his pro rata share of the $27,067.27 restitution owed on Count 1, $4,814.86 for his pro rata share of the $14,444.58 restitution owed on Count 2, and $4,818.86 of the $14,444.59 restitution owed on Count 3. **See** Docket No. CP-67-SA-0000232-2014, p. 7. The court ordered Melissa to pay $13,533.63 for her pro rata share of the $27,067.27 restitution owed on Count 1, $4,814.86 for her pro rata share of the $14,444.58 restitution owed on Count 2, and $4,818.86 of the $14,444.59 restitution owed on Count 3. **See** Docket No. CP-67-SA-0000220-2014, p. 6. The court ordered Barbara to pay $4,814.86 for her pro rata share of the $14,444.58 restitution owed on Count 2, and $4,818.87 of the $14,444.59 restitution owed on Count 3. **See** Docket No. CP-67-SA-0000219-2014, p. 6.

[12] The trial court issued a single Pa.R.A.P. 1925(a) opinion that discussed Leahy, Melissa, and Barbara's convictions.

[2.] Whether the [c]ourt's determination of [Appellant's] guilt in regards to the harassment charge was supported by sufficient evidence and the applicable law.

Leahy's Brief, p. 8. These claims are waived and/or otherwise meritless.

Initially, we note that Appellants waived their sufficiency of the evidence claims by filing insufficient 1925(b) statements.

Pennsylvania Rule of Appellate Procedure 1925 requires that an appellant "concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues[.]" Pa.R.A.P. 1925(b)(4)(ii). "When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review." *Commonwealth v. Allshouse*, 969 A.2d 1236, 1239 (Pa.Super.2009) ("When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues.").

This Court has explained that "[i]n order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient." *Commonwealth v. Garland*, 63 A.3d 339, 344 (Pa.Super.2013); *see also Commonwealth v. Garang*, 9 A.3d 237, 244 (Pa.Super.2010). The Court further explained that "[s]uch specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Id.*

Failure to identify what specific elements the Commonwealth failed to prove at trial in a 1925(b) statement renders an appellant's sufficiency of the evidence claim waived for appellate review. ***Id.***

Here, Appellants were convicted of cruelty to animals, which contains multiple elements. Leahy was also convicted of harassment, which also contains multiple elements. Appellants' 1925(b) statements claim that the Commonwealth put forth insufficient proof to support these convictions, but fail to state with specificity any particular element of either crime the Commonwealth failed to prove.[13] Although they later expounded on and

_____

[13] Appellants' 1925(b) statements each purport to raise the following issues:

> 1. Whether the [c]ourt's determination of [Appellants'] guilt in regards to the cruelty to animals charges was supported by sufficient evidence and the applicable law.
>
> 2. Whether the [c]ourt's determination of [Appellants'] guilt in regards to the cruelty to animals charges was supported by sufficient evidence to prove each element of [the] crime beyond a reasonable doubt.
>
> 3. Whether the [c]ourt's determination of [Appellants'] guilt in regards to the cruelty to animals charges was a plain abuse of discretion considering the facts of the case applied to relevant case law and the Commonwealth's Cruelty to Animals statute 18 Pa.C.S.[] § 5511(c).

Appellants' Pa.R.A.P. 1925(b) Concise Statements of Matters Complained of on Appeal, p. 1. Additionally, Leahy's 1925(b) statement purports to further raise the following issues:

*(Footnote Continued Next Page)*

expanded sufficiency of the evidence claims in their appellate briefs, Appellants' sufficiency claims have no direct counterparts in their 1925(b) statements, and are therefore not properly before this Court. Therefore, Appellants have waived their sufficiency of the evidence claims. **See Garland**, **supra**. Even if not waived, however, Appellants' sufficiency of the evidence claims lack merit.

Appellants first claim that the evidence was insufficient to maintain their cruelty to animals convictions because the Commonwealth did not proffer evidence that they acted "wantonly or cruelly" regarding their treatment of the animals. **See** Leahy's Brief, pp. 14-16; Barbara's Brief, pp. 11-13; Melissa's Brief, pp. 11-13. Specifically, Appellants argue that the trial judge's comments from the bench illustrate that the Commonwealth failed to prove that they acted cruelly or wantonly. **See id.** Although the

_(Footnote Continued)_ —————

4. Whether the [c]ourt's determination of [Appellant's] guilt in regards to the harassment charge was supported by sufficient evidence and the applicable law.

5. Whether the [c]ourt's determination of [Appellant's] guilt in regards to the harassment charge was supported by sufficient evidence to prove each element of [the] crime beyond a reasonable doubt.

6. Whether the [c]ourt's determination of [Appellant's] guilt in regards to the harassment charge was a plain abuse of discretion considering the facts of the case applied to relevant case law and the Commonwealth's Harassment statute 18 Pa.C.S.[] § 2709.

Leahy's 1925(b) Statement of Matters Complained of On Appeal, p. 2.

trial judge stated that Appellants did not act cruelly or wantonly, this statement does not afford them relief from the judgments of sentence under these facts.

When examining challenges to the sufficiency of evidence, this Court's standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super.2011), *appeal denied*, 32 A.3d 1275 (Pa.2011).

The Crimes Code defines cruelty to animals as follows:

**Cruelty to animals.—**

(1) A person commits an offense if he wantonly or cruelly ill[-]treats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care, whether belonging to himself or otherwise, or abandons any animal, or deprives any animal of necessary sustenance, drink, shelter or

- 11 -

veterinary care, or access to clean and sanitary shelter which will protect the animal against inclement weather and preserve the animal's body heat and keep it dry.

18 Pa.C.S. § 5511(c)(1).

To convict a defendant of cruelty to animals based on ill-treatment, overloading, beating, abuse, or neglect of an animal, the Commonwealth must prove a defendant acted either cruelly or wantonly.[14] *See Commonwealth v. Tomey*, 884 A.2d 291, 294 (Pa.Super.2005); *Commonwealth v. Simpson*, 832 A.2d 496, 500 (Pa.Super.2003). Likewise, the Commonwealth must also prove that a defendant acted either cruelly or wantonly to convict under the latter portion of the cruelty to animals statute, which prohibits the abandonment of animals or the deprivation of food, water, shelter, or veterinary care. *See Tomey*, 884 A.2d at 295 (deprivation of clean and sanitary shelter).

---

[14] This Court has approved the following definition of "wanton" in applying the animal cruelty statute:

Wanton misconduct means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences.

*Commonwealth v. Tomey*, 884 A.2d 291, 295 (Pa.Super.2005) (quoting *Lewis v. Miller*, 543 A.2d 590, 592 (Pa.Super.1988)).

In **Tomey**, police obtained and executed a search warrant for the defendant's home, which resulted in the removal of fourteen (14) Siberian Huskies from the residence. **Tomey**, 844 A.2d at 292. During the execution of the search warrant, police observed the residence reeked of an overpowering odor of ammonia emanating from large amounts of dog feces and urine spread about the floors, and was otherwise filthy throughout. **Id.** The police further noted that all the food and water containers in the house, including the toilet, were empty. **Id.** The animals themselves required extensive cleaning and grooming upon removal. **Id.** At trial, a veterinarian testified that, although the animals were in generally good health, the conditions in the home were unsafe, unsanitary, and posed a threat to the dogs. **Id.** On these facts, this Court did not hesitate to affirm the defendant's conviction for cruelty to animals based on deprivation of sanitary shelter. **Id.** at 295-96.

At trial of the instant matter, the Commonwealth presented the testimony of Officer Kessler, Pennsylvania State Police Trooper Ryan Speece, Reba's previous owner, Kirsten Henry, and veterinarians Dr. Barbara Strock and Dr. Penny Grove.

Officer Kessler testified that she presented to Leahy's property to investigate an anonymous report of animals living in sub-standard conditions. Melissa and Barbara met Officer Kessler and directed her to the animals. Officer Kessler described her observations for the court. She observed numerous emaciated Newfoundland dogs, without water, without

adequate shelter, in an undersized area strewn with massive amounts of unattended-to dog feces, including diarrhea and stools containing blood. The dog area contained wires and nails sticking out at dog eye- and body-level. Feces and fleas covered the dogs, two had bacterial and skin infections, and one had severe anatropia.

Officer Kessler also testified she observed twelve horses and one donkey together in an area approximately one-third to one-half of an acre of land[15] that contained no visible grass, hay, or grain for the animals to eat and two water troughs, one of which was filled with solid water ice, the other of which was completely empty. Officer Kessler explained that Reba in particular drew her attention. The horse was extremely emaciated and had bite marks and dermatitis all over her body, which Officer Kessler explained results from bite wounds and horse lice. Horse lice[16] so infested Reba's body that the lice were jumping off Reba onto Officer Kessler.

Officer Kessler also observed two pigs and quite a few chickens living in the squalor of the property.

---

[15] Officer Kessler testified that the appropriate living space for horses is two acres per animal. Accordingly, the horse area should have been well over twenty acres.

[16] Officer Kessler explained that horse lice occurs only in extreme neglect situations, where animals are confined to very tight spaces and unsanitary living conditions, and that she had only ever encountered horse lice twice in her life.

Pennsylvania State Police Trooper Ryan Speece testified that, when he arrived, he could see Reba's ribs and spine, and that the horse was generally in poor condition.

Kirsten Henry testified that she had owned Reba for around ten years before giving the horse to Leahy and Melissa in the spring of 2013, assuming they intended to employ Reba as a pasture horse for their grandchildren to ride. Ms. Henry testified that when she gave the horse to Leahy and Melissa, Reba was healthy; she was of an adequate weight, up to date on her veterinary necessities, and had never had trouble eating or instances of dropping significant amounts of weight. Further, Ms. Henry explained that in the spring of 2013, Reba had been fit for light riding. Ms. Henry testified that when she saw Reba after the authorities had confiscated her, she was emaciated, very underweight, and infested with visible horse lice.[17]

Dr. Barbara Strock, a veterinarian with 27 years' experience, testified to the appropriate conditions for raising dogs. Dr. Strock testified that dogs need appropriate amounts of food, shelter, space, and fresh water to drink. She testified that feces and other waste should be attended to multiple times daily. Additionally, she testified that the Newfoundlands had insufficient space in which to live. Following their confiscation, Dr. Strock examined the

---

[17] Ms. Henry ultimately took Reba back to her family farm as a foster horse and successfully nursed her back to health.

six dogs and found that five of the six were infested with fleas, four had dermatitis (skin infection), two had otitis (ear infection), one was functionally blind and another had severe anatropia, and three had Lyme's disease. She explained the dogs' low weight was probably caused by poor nutrition.[18]

Equine veterinarian Dr. Penny Grove testified she saw Reba over the course of several years while she was in Ms. Henry's care, and that Reba had been in good health at that time. Dr. Grove examined Reba the day of her confiscation and noted the horse was extremely thin[19] to the point of her skeleton being visible. Reba further had patches of alopecia (hair loss) and dermatitis (skin infection) on her face, neck, back, between her legs, and under her jaw. Additionally, Dr. Grove observed horse lice crawling on Reba's face.[20] Dr. Grove testified Reba's condition on February 19, 2014 was not the result of old age. Instead, she explained that, in her

---

[18] Dr. Strock examined one of the worst-off dogs a month after their confiscation and noted that the animal's condition had markedly improved.

[19] Dr. Grove explained that equine veterinarians evaluate horses' body structure on a scale from one to nine, with five being optimal, nine being grossly obese, and one being emaciated. Dr. Grove explained that previously, while under Ms. Henry's care, Reba's body structure had been a five, but that on the day of the confiscation, it had deteriorated to a two.

[20] Like Officer Kessler, Dr. Grove explained that horse lice occur when a horse endures a stressful or malnourished existence.

professional opinion, Reba's poor state was the result of poor living conditions and lack of care.[21]

This evidence caused the trial court to convict Appellants of cruelty to animals. The trial court explained:

> And I have – Despite defense testimony to the contrary, I have little doubt that, in fact, there was neglect and that there was a failure to provide necessary sustenance, drink, shelter, veterinary care, and that that neglect applied to all of the animals, all of the horses, the donkey, the mini mars or mini horses, and all of the dogs, the Newfoundlands, the dachshund and puppies.

N.T. 9/16/2014, p. 31. Additionally, the trial court stated in its 1925(a) opinion:

> [T]he evidence presented was overwhelming in regard to proof beyond a reasonable doubt. . . . [T]here was testimony about the appearance of the animals from which a circumstantial conclusion could be reached that the animals did not receive proper care.

1925(a) Opinion, p. 1. Clearly, the trial court was convinced that Appellant had failed to provide necessary sustenance, drink, shelter, and veterinary care to their animals to the point of guilt under the cruelty to animals statute.

Our review of the evidence leads us, without hesitation, to the same conclusion reached by the trial court – that the evidence was sufficient to

---

[21] Dr. Grove offered similar testimony regarding another horse named Brandy.

support Appellants' cruelty to animals convictions based on their failure to provide the animals under their care with necessary sustenance, drink, shelter, and veterinary care. The animals in question resided in and around Appellants' home. Therefore, the trial court was entitled to infer that Appellants were aware that they undernourished and improperly cared for their animals. This inference suffices to sustain a finding that Appellants acted wantonly regarding the care of the animals. *See Tomey*, *supra*. Appellants' sufficiency of the evidence claims regarding the cruelty to animals conviction fail.[22]

_____

[22] We acknowledge that, immediately after stating that it had little doubt that Appellants had neglected the animals and failed to provide them with necessary sustenance, drink, shelter, veterinary care, the trial court stated the following:

> I certainly agree with defense counsel that this does not fall under the wanton or cruelty or abuse. It's specifically under the neglect portion of the statute. And I don't doubt that [Appellants] actually may have believed that they were giving proper care, that they loved and enjoyed their animals and didn't fully understand that their failures actually put their animals in danger.
>
> The section doesn't require that. What is requires is that, in fact, they failed to provide these things and they did, by their failures, neglect the animals.

N.T. 9/16/2014, pp. 31-32.

As discussed *supra*, this apparent effort by the trial court to humanize Appellants misstates the law: a showing of wantonness or cruelty is required to convict a defendant of cruelty to animals based on negligence or deprivation of basic needs. Appellants argue that the above statement was a trial court factual finding that they did not act with the requisite culpability

*(Footnote Continued Next Page)*

Leahy also argues that the Commonwealth failed to prove harassment beyond a reasonable doubt because it did not prove that his actions were either intended to annoy and/or served no legitimate purpose. **See** Leahy's Brief, pp. 16-17. He is incorrect.

*(Footnote Continued)* ─────────────

and by which this Court is now bound. Contrary to Appellants' arguments, however, the trial court's misstatement of law and mischaracterization of the evidence does not does not necessitate the conclusion that the Commonwealth adduced insufficient evidence to convict Appellants of cruelty to animals.

We are not bound by a trial court's incorrect conclusions of law. **See Commonwealth v. Gary**, 91 A.3d 102, 106 (Pa.2014) (quoting **Commonwealth v. Russo**, 934 A.2d 1199, 1203 (Pa.2007)) (suppression); **Hatalowich v. Redevelopment Auth. of City of Monessen**, 312 A.2d 22, 23 (Pa.1973) ("[Appellate courts] are always free, and indeed are duty bound, to modify erroneous applications of law[.]"). Therefore, to the extent they misstate the law, the trial court's comments have no bearing on our analysis. Additionally, this Court is bound only by the trial court's factual findings that are supported by the record. **See Commonwealth v. Holley**, 945 A.2d 241, 247 (Pa.Super.2008) (when reviewing the sufficiency of the evidence, appellate courts may not substitute their judgment for that of a fact-finder; if the record contains support for the convictions they may not be disturbed). The instant record simply does not support a conclusion that Appellants did not act in a wanton fashion. **See Tomey**, **supra**. Accordingly, our resolution of this appeal does not represent a substitution of judgment for that of the trial court as fact finder. Instead, our conclusion is completely consistent with the trial court's verdict. It is the trial court's remarks that are at odds with the trial court's immediately preceding comments, the court's characterization of the evidence of guilt as "overwhelming" in its 1925(a) opinion, the verdict, and this Court's review of the evidence. In short, the trial court's remarks – to the extent they can be argued to represent a finding of fact – are completely unsupported by evidence admitted at trial viewed in the light most favorable to the Commonwealth as verdict winner. **See Commonwealth v. Miller**, 787 A.2d 1036, 1038 (Pa.Super.2001) ("[I]f a trial court's decision is correct, we may affirm on any ground.").

- 19 -

The Crimes Code defines harassment, in relevant part, as follows:

**(a) Offense defined.--**A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:

. . .

(3) engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose;

(4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures[.]

18 Pa.C.S. § 2709. "Course of conduct" is defined as "[a] pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct." 18 Pa.C.S. § 2709(f).

Here, Officer Kessler testified as to her interactions with Leahy. She detailed Leahy's behavior towards her at the property, as well as on the telephone thereafter. First, at the property, Leahy screamed at her, called her an "incompetent idiot," and generally acted in an abusive and aggressive fashion toward her to the point where she needed to call the Pennsylvania State Police for backup support. Later that day, Leahy telephoned Officer Kessler, called her a "bitch" and a "fucking idiot," accused her of stealing his horse, demanded that she return the horse, and told her that he was going to "get her." Officer Kessler told Leahy not to call back. Later the same day, Leahy again called Officer Kessler and left a message on her answering machine regarding the seized animals. Viewed in the light most favorable to

the Commonwealth as verdict winner, these actions support Leahy's harassment conviction.

Further, we find unconvincing Leahy's suggestion that, given her line of work, Officer Kessler should have been used to such behavior.[23] No matter how likely it is that her line of work may expose her to such conduct, Officer Kessler's familiarity with such behavior neither makes it "understandable" nor removes it from the gambit of harassment. Accordingly, we affirm Leahy's harassment judgment of sentence.

Judgments of sentence affirmed.

President Judge Emeritus Bender joins the Memorandum.

Judge Strassburger files a Concurring Memorandum.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Prothonotary


Date: 6/5/2015

---

[23] Leahy argued:

> It seems understandable and likely that [Officer] Kessler, in her role as an animal control officer, would receive an occasional irate phone call from someone that had just had their animal seized inquiring as to the reasons why the animal was seized[.]

Leahy's Brief, p. 16.